# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America | |
| v. | Case No. 25-MJ-501 |
| **TIMOTHY SIVERD,** | |
| *Defendant* | |

## CRIMINAL COMPLAINT

I, Scott M. Kendall, the complainant in this case, state that the following is true to the best of my knowledge and belief: between on or about November 5, 2022, and September 19, 2024, in the Western District of New York and elsewhere, the defendant, TIMOTHY SIVERD violated:

(1) 18 U.S.C. § 1343 (Wire Fraud);
(2) 18 U.S.C. § 1029 (Access Device Fraud); and
(3) 18 U.S.C. § 1028A (Aggravated Identity Theft).

This Criminal Complaint is based on these facts: **SEE ATTACHED AFFIDAVIT OF HSI SPECIAL AGENT SCOTT M. KENDALL.**

☒ Continued on the attached sheet.

SCOTT M. KENDALL, HSI SPECIAL AGENT

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim. P. 4.1 and 4(d) on:

Date: January 8, 2025

*Judge's signature*

City and State: Rochester, New York

MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF MONROE   )   ss:
CITY OF ROCHESTER   )

I, SCOTT M. KENDALL, being duly sworn, depose and state:

1. I am a Special Agent with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and have been so employed since March 2021. I am currently assigned to the HSI Rochester office. My responsibilities include investigating violations of federal criminal laws, including crimes involving smuggling, narcotics trafficking, fraud, and money laundering. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, and Title 21 of the United States Code.

2. As part of my employment as an HSI Special Agent, I have participated in the execution of search and arrest warrants, conducted surveillance, reviewed financial records, served subpoenas, and carried out other investigative duties. I received a bachelor's degree in finance from the Canisius College of Buffalo, where I took numerous classes in finance and accounting. I was previously employed as an accounting assistant as well as a loan processor at a financial institution. I received training in financial investigations and constitutional law throughout approximately twenty-seven weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia. Through my training and experience, I have become familiar with the ways in which money is illegally or fraudulently obtained and laundered to avoid detection by law enforcement.

3. This affidavit is submitted in support of a Criminal Complaint charging TIMOTHY SIVERD with violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1029 (Access Device Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "TARGET OFFENSES").

4. As more fully described below, the facts set forth in this Affidavit are based on my personal knowledge, information that I have learned from witnesses, records, and documents obtained from both law enforcement and publicly available sources, and conversations with other experienced law enforcement officers.

5. Because this Affidavit is being submitted for the limited purpose of applying for a criminal complaint, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that SIVERD has committed the TARGET OFFENSES.

6. Unless otherwise indicated, conversations discussed herein are described in sum and substance rather than verbatim.

## BACKGROUND OF INVESTIGATION

7. In June 2021, members of the Monroe County Sheriff's Office and HSI Rochester began investigating SIVERD as a suspect in a fraudulent investment scheme. In this scheme, two victims agreed to invest their money with SIVERD on multiple occasions in what they believed was a real estate partnership. In reality, SIVERD stole the victims' "investment" funds. On or about October 6, 2022, the Honorable Mark W. Pedersen, U.S. Magistrate Judge for the Western District of New York, signed a criminal complaint, Case No. 22-MJ-689, charging SIVERD with violating 18 U.S.C. §§ 1343 (Wire Fraud), and 1956 & 1957 (Money Laundering).

8. On or about April 29, 2024, in the Western District of New York, SIVERD pled guilty to a one-count Information charging a violation of 18 U.S.C. § 1343 before the Honorable Charles J. Siragusa, in relation to the fraudulent investment scheme. Sentencing was initially scheduled for August 27, 2024.

9. On or about June 4, 2024, SIVERD moved to adjourn his sentencing by 90-days. SIVERD's purported reason for the adjournment, through his attorney, was that he wanted to pay the entire $396,511.11 in restitution to the two victims of his wire fraud before sentencing took place. In order to "unequivocally insure [his] ability to pay the required restitution amount in full, prior to sentencing," he wanted to expand his commercial cleaning business, ROC Scrubby LLC ("ROC Scrubby"). SIVERD, through his attorney, described this cleaning business as "successful" and expected it to double in size by August.

10. Accordingly, SIVERD's sentencing was adjourned. After two additional adjournments, as of the date of this Affidavit, sentencing is scheduled for February 10, 2025.

11. Based on the following information obtained over the course of this investigation, there is probable cause to believe that SIVERD, shortly after his arrest in October 2022 and throughout the pendency of his criminal proceedings described above, has been using ROC Scrubby to undergo a scheme to defraud ROC Scrubby customers unrelated to the real estate investment scheme he has pled guilty to. Specifically, SIVERD has over-billed his customers' credit cards and fraudulently obtained free labor for his business, in violation of the TARGET OFFENSES.

## **PROBABLE CAUSE**

*Information Received from ROC Scrubby Employee*

12.  On or about August 9, 2024, HSI Rochester Task Force Officer ("TFO") Steven Thomsen and I met with an individual with the initials K.T. ("WITNESS 1" or "W1"). W1 worked as a cleaner at ROC Scrubby for SIVERD and stated that she knew SIVERD was utilizing ROC Scrubby to over-bill customers in excess of tens of thousands of dollars.

13.  W1 stated, in sum and substance, that she began working for SIVERD, who W1 always knew as "Tim McQueen,"[1] after she found an advertisement on Craigslist for a cleaning job about one year prior. W1 stated that there were four or five other cleaners who worked for ROC Scrubby.

14.  W1 stated that ROC Scrubby was run via a mobile phone application called "BookingKoala." BookingKoala is an online/mobile application-based platform that is used by businesses to manage their company appointments, sales, and employees, among other facets of their business management.

15.  BookingKoala allowed for SIVERD to schedule cleaning appointments for his employees and bill customers for those appointments. W1 stated that SIVERD created W1's account for the app, and that the cleaner would not book appointments or handle payments.

16.  W1 stated that, as her employment carried on, she gradually started to hear more

---

[1] Based on this investigation and the previous investigation into SIVERD, investigators were aware that SIVERD used aliases in connection with his fraudulent schemes, including "McQueen" and "Buttino." "McQueen" is the maiden name of SIVERD's wife, and "Buttino" is the maiden name of his mother. For the purposes of this Affidavit, the name SIVERD will be used when referring to SIVERD, even if witnesses referred to him as a known alias.

4

and more complaints from customers that they were being over-billed or double-billed for ROC Scrubby's cleaning services, or billed for work that was never performed.

17. W1 further stated that she believed it was through the BookingKoala app that SIVERD was able to over-bill his customers, since the app gave SIVERD access to each customer's credit or debit card information. W1 showed TFO Thomsen and I the BookingKoala app on her phone, which revealed that W1 was still scheduled to clean for multiple customers, despite the fact that W1 had not been employed by ROC Scrubby for several weeks at that time. W1 stated that she believed that the customers would be billed for the cleaning even though W1 would not actually perform the cleaning service, since she no longer worked for SIVERD.

18. BookingKoala records obtained later in the investigation corroborated W1's prediction. In response to a subpoena, BookingKoala provided ROC Scrubby appointment records for each cleaner. The appointment records list W1 as performing cleaning services on August 14, 2024, and August 28, 2024. These BookingKoala records included "Clocked In" and "Clocked Out" times, despite W1 stating on August 9, 2024, that she resigned employment with ROC Scrubby on or around July 20, 2024, and specifically noting that she would not be performing the two additional August cleanings.

19. W1 also stated that the customers would repeatedly raise the issue with SIVERD and he would claim to fix the issue and refund money, but customers stated that he would either not refund the money, give a partial refund, or give a full refund only to again over-bill the customers on a later date. W1 stated that she knew of at least five customers who were over-billed so often that they changed their credit or debit card numbers to stop it. W1 provided contact information for several other victims that W1 knew had been over-billed.

20.     W1 also referred to other suspicious activity of SIVERD's. For example, at one point during her employment, SIVERD asked W1 to open another cleaning business in her name, which SIVERD would manage and essentially be the owner of but W1 would be the owner "on paper." W1 stated that it sounded strange and she did not want to get involved in a situation like that, so she never agreed to do it.

21.     W1 stated that she tried to be a good "ambassador" for the company and would assure customers that the various over-billings were just mistakes, but got sick of having to "cover" for SIVERD and resigned from ROC Scrubby on or about July 20, 2024.

*Information Received from VICTIMS 1 & 2*

22.     On August 13, 2024, TFO Thomsen and I conducted an interview of individuals with the initials E.K. ("VICTIM 1" or "V1") and A.K. ("VICTIM 2" or "V2"), both 71 years old at the time, who were suspected victims of SIVERD's over-billing scheme. The following is a summary of the statements made by V1 and V2:

23.     Over the course of the previous year or two, V2 was suffering health problems and was in and out of the hospital multiple times. V1 and V2 decided to hire ROC Scrubby for their home cleaning services because V2's health problems made home maintenance difficult. V1 had also put V1 and V2's credit cards on "auto-pay," instead of manually checking the statements each month, because of V2's medical bills and being busy with V2's health issues.

24.     At some point roughly a year and a half after signing up with ROC Scrubby, V1 tried to make a purchase with V1 and V2's Discover credit card, but the card was declined. V1 then logged into their Discover account and saw that they had hit their credit limit, which V1 knew was not possible based on their spending. V1 and V2 then went back through their last two

years of credit card statements and identified approximately $38,000 in extra credit card charges from ROC Scrubby. V1 stated that he had received two cleanings per month for $175 each for about a year and a half, and the statements clearly showed they had been billed far more than that.

25. V1 stated that after reviewing the credit card statements, the fraudulent charges appeared to start off slow but after a few months became more blatant, increasing in the number of charges and amount charged. For example, on one particular day there were 8 separate charges. Moreover, some of the charges were for as much as $675 each, as opposed to the $175 normal cleaning charge.

26. After finding these charges in May 2024, V1 contacted SIVERD, who V1 knew as "Tim Buttino." SIVERD stated that he was going to have his accountant look into the problem and issue a refund.

27. After a few weeks without hearing anything back, V1 again contacted SIVERD. SIVERD stated that he and his accountant found that V1 and V2 were overcharged and would be refunded $37,500 via certified check. V1 and V2 did get a check in their mailbox, but it was not a certified check and it bounced. The memo line on the check stated that it was for "Refund-Over Billing."

28. V1 then contacted SIVERD again via email. SIVERD sent a series of emails instructing his purported assistant, "Amanda Reilly" to go to the bank and get a certified check, with V1 copied on the emails. The last contact V1 had with SIVERD was via email, and he stated that he had mailed a certified check to V1, which V1 told SIVERD they had never received. SIVERD then stopped responding to V1's emails, and V1 reported the incident to the New York

State Attorney General's Office Consumer Fraud Division on or about June 07, 2024.

29.     V1 and V2 eventually blocked future charges from ROC Scrubby. BookingKoala records show a total of 7 attempted, but failed, charges to V1 and V2's BookingKoala account after the charges were blocked.

30.     Searches of law enforcement databases have revealed no individuals named Amanda Reilly in the Rochester area matching the estimated age range of SIVERD's purported employee.

31.     V1 stated that he had never used an app or website to book cleanings; he did everything through the phone after initially finding the company online. This included providing his credit card information to SIVERD for billing purposes. Accordingly, there is probable cause to believe that SIVERD manually used this credit card information without lawful authority from V1 or V2 to over-bill them in furtherance of his fraudulent scheme. V1 and V2's credit card information is a "means of identification" within the meaning of 18 U.S.C. § 1028A.

32.     V1 and V2 stated that, to date, they have not received any type of refund from ROC Scrubby. V1 stated that he did receive a partial refund directly from Discover for the latest over-billings, but it was not even close to the total amount they were overcharged because the vast majority of over-billings had occurred too far in the past to be refunded.

33.     Search warrant returns for the email addresses SIVERD used to converse with V1 and V2 identified numerous other victims attempting to complain to ROC Scrubby about being over-billed for cleanings that were never performed.

*Information Received from VICTIM 3*

34.    On August 13, 2024, TFO Thomsen and I conducted an interview of another suspected victim, an individual with the initials T.D. ("VICTIM 3" or "V3"). V3 stated, in sum and substance, that V3 and her husband became customers of ROC Scrubby after V3's sister signed them up for cleaning services while V3 was in the hospital in January 2024. She connected their Apple credit card to a BookingKoala account and shortly thereafter started seeing weekly charges from ROC Scrubby, even though they only had a cleaner coming once per month.

35.    V3's husband emailed ROC Scrubby about the issue, was contacted via phone, and was told that the billing problem would be fixed. However, they continued to be billed for cleaning services that were not provided. V3 stated she believed they were reimbursed two or three times in the form of free cleanings, but were never reimbursed for four or five extra charges.

36.    V3 stated that when the extra charges started, V3 and her husband removed their payment method from the app and received a confirmation email stating that their credit card was removed. However, they were still billed for cleanings they did not receive after the payment method was removed, indicating that SIVERD maintained their credit card information and was manually billing them even after the billing information was removed from the app.

37.    After V3 cancelled services with ROC Scrubby, she saw that they were still scheduled for a cleaning in the app. V3 was also billed once by "WNY Maids,"[2] a company she

---

[2] Based on New York State records, it appears ROC Scrubby is the only business entity affiliated with SIVERD that is formally registered with the state. However, it appears SIVERD uses several D/B/As or unregistered business entities when interacting with various witnesses and victims, including "WNY Maids," "Maids of Upstate and Western New York," and "ROC Janitorial Services." All of these entities are controlled by SIVERD and will be referenced as ROC Scrubby below.

9

and her husband never hired at any point, so they ended up requesting new credit card numbers from Apple to finally stop the billings.

38.     After V3 got the new credit card number, BookingKoala records indicate there were two attempted, but failed, charges to V3's BookingKoala account on September 19, 2024, and October 17, 2024.

*BookingKoala Records*

39.     On or about November 12, 2024, BookingKoala provided business records concerning ROC Scrubby to law enforcement. SIVERD was operating ROC Scrubby under the name "Maids of Upstate and Western NY" in BookingKoala's system. The business records included, among other information, a list of ROC Scrubby customers and employees, and records of customer's bookings/appointments. Additionally, on or about November 22, 2024, BookingKoala provided additional records, including system logs pertaining to ROC Scrubby's account activity.

40.     A review of this data revealed approximately 1,331 "extra charges" that appear to have been manually entered by "Tim Siverd" or "Tim Buttino." Below is a visual sample of some of the extra charges applied to V1 and V2 discussed above, as listed in BookingKoala's data:

| Date/Time | Entry | User | IP |
|---|---|---|---|
| 04/24/2024 4:40 AM | #9440 - booking(s) pre-charged for ▮ | by tim buttino | 8.47.99.225 |
| 04/24/2024 6:25 AM | #9089 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/24/2024 9:39 AM | #9089 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/24/2024 6:25 PM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/25/2024 12:57 PM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/25/2024 1:19 PM | #8893 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:11 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:18 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:19 AM | #9227 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:29 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:29 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:29 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:29 AM | #9440 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |
| 04/29/2024 6:32 AM | #9227 - extra charge created for ▮ | by tim buttino | 8.47.99.225 |

41.     As depicted above, V1 and V2 were billed three times on April 24, 2024, twice on April 25, 2024, and eight times on April 29, 2024. A review of the "Active Booking Details" data provided by BookingKoala revealed that out of the above dates, V1 and V2 only had a scheduled cleaning service on April 24, 2024, which they did receive and were billed the normal cleaning charge of $175 for. Below are the 14 charges to V1 and V2's credit card that appear to correspond with the 14 charges above:

| Date | Description | Category | Amount |
|---|---|---|---|
| 04/24 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019709224366 | Services | $175.00 |
| 04/24 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019709324271 | Services | $475.00 |
| 04/24 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019710254297 | Services | $475.00 |
| 04/24 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019715542189 | Services | $375.00 |

| 04/25 | SQ *ROC SCRUBBY GOSQ.COM NY 000115292151392482648O | Services | $375.00 |
| 04/25 | SQ *ROC SCRUBBY GOSQ.COM NY 0001152921513925133100 | Services | $375.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744747493 | Services | $475.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744782170 | Services | $675.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744776569 | Services | $675.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744787011 | Services | $675.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744749918 | Services | $475.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744753878 | Services | $675.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744776832 | Services | $675.00 |
| 04/29 | SQ *ROC SCRUBBY GOSQ.COM NY 0002305843019744782186 | Services | $675.00 |

42. Based on the above data and discussions with BookingKoala's co-owner, who supplied the data, the $175 "pre-charged" billing in ¶ 40 was likely a part of V1 and V2's ordinarily scheduled cleanings. However, the following 13 "extra charge[s]" for $375-$676 would have been charges that SIVERD manually applied to V1 and V2's account.

43. Including these 13 fraudulent charges noted above, there were a total of approximately 134 "extra charges" applied to V1 and V2's credit card from the time period of May 21, 2023, through May 2, 2024, totaling approximately $37,716.78. This total is very close to the dollar amount that SIVERD acknowledged was over-billed in his bounced check to V1 and V2, as referenced in ¶ 27 of this Affidavit.

44. In this same time period, V1 and V2 actually received cleaning services on approximately 35 occasions, which they were also billed $175.00 for each cleaning.

45. Reviewing the rest of BookingKoala's data, "extra charge[s]" were similarly created by SIVERD under the name "Tim Siverd" or "Tim Buttino" for approximately 58 other ROC Scrubby customers. Including charges made to V1, V2, and V3, a total of approximately 1,331 extra charges totaling approximately $163,802.51 were applied to ROC Scrubby customers. As stated above, the co-owner of BookingKoala confirmed that these "extra charge[s]" would have been manually entered by the account administrator. There have also not been any reported issues with the BookingKoala software that could have caused extra charges to be processed automatically.

46. Accordingly, there is probable cause to believe that SIVERD used these customers' access devices without authorization to obtain greater than $1,000 in proceeds during a one-year period.

*ROC Scrubby Employee-Related Fraud*

47. On or about November 4, 2024, I received information that the United States Department of Labor's Wage and Hour Division was investigating SIVERD for failing to pay wages to former employees.

48. TFO Thomsen and I spoke with one former employee, an individual with the initials "C.A." ("VICTIM 4" or "V4"). V4 stated that, after knowing SIVERD for some time, he offered V4 a job to work for his cleaning company, "ROC Janitorial Services." V4 began working for SIVERD in Spring of 2024 doing marketing and sales work.

49. V4 stated that she was to be paid $30 per hour for 15-20 hours of work per week, plus commission on certain customers and/or contracts that she secured, and sent SIVERD's purported assistant "Amanda Reilly" the hours that she worked each week. V4 stated that she

13

was initially given two paychecks in the amount of $1,300 and $350, but after that, stopped getting paid. V4 stated that "Amanda" and SIVERD initially attributed this to an issue with their payroll software and V4's status as a 1099 employee. SIVERD assured V4 that she would be paid after the issue was resolved.

50. The phone number purportedly belonging to "Amanda Reilly" was actually registered under the company Ad Hoc Labs, Inc., D/B/A "Burner," which is a company that provides alternative phone numbers for individuals to use via a paid mobile application. According to Burner records, this number was owned by the same cell phone number that SIVERD was known to use, and matched the public number listed for ROC Scrubby through open sources.

51. V4 continued to work for SIVERD for weeks without pay based on SIVERD's assertion that he would eventually be able to pay her back wages. V4's work included securing a high value commercial cleaning contract for SIVERD, which he stated she would receive a commission on. However, V4 was ultimately never paid her back wages or any commission on her secured contracts. V4 is still owed approximately $5,025 in wages alone.

52. V4 believed SIVERD would eventually pay her based on an assortment of lies relating to SIVERD's attempts to pay her. For example, V4 stated that around the end of July or beginning of August 2024, SIVERD said that he was going to give her a check for $20,000 as a gift, to thank her for being a good employee and taking care of SIVERD's child, which V4 stated she did often. SIVERD then gave V4 a check for $20,000 which she deposited into her bank account and spent over several days. However, several days after these purchases were made, SIVERD's check bounced and V4's bank deducted $20,000 from her account.

53. V4 then confronted SIVERD about the bounced check. SIVERD said that he was shocked, and then appeared to make a phone call to who he later stated was his "financial advisor." SIVERD then began texting V4 and his "financial advisor," who he identified as an individual with the initials P.B. ("VICTIM 5" or "V5") in a text message group. Open-source research showed that "P.B.'s" name was the same as an individual working at a financial services company locally. Via text, SIVERD and "P.B." appeared to be attempting to resolve the bounced check issue. SIVERD later told V4 that the check bounced because there was fraud detected in his account, and the issue would be resolved. After additional text messages with "P.B.," SIVERD sent V4 another check for $20,000 and told V4 that he would contribute $17,000 to her retirement account as well. The check bounced again.

54. The phone number purportedly belonging to "P.B." was registered under Ad Hoc Labs, Inc., D/B/A "Burner." According to Burner records, this number was also owned by the same cell phone number that SIVERD used in his text conversations with V4, and matched the public number listed for ROC Scrubby through open sources. Furthermore, the Burner number was created on the same date that it was first used to message V4.

55. SIVERD then sent V4 two wire transfers, which also failed. After the second failed wire transfer, SIVERD began texting V4 in a group with a purported employee of his bank, where they appeared to resolve the issue. However, SIVERD never transferred V4 the money.

56. The phone number purportedly belonging to the bank employee was registered under Ad Hoc Labs, Inc., D/B/A "Burner." According to Burner records, this number was owned by the same cell phone number that SIVERD used in his text conversations with V4, and matched the public number listed for ROC Scrubby through open sources. Furthermore, the

Burner number was created on the same date that it was first used to message V4.

57. After the repeated bounced checks and failed wire transfers, V4 purportedly asked SIVERD for the $20,000 in cash, which SIVERD agreed to give. While V4 was waiting at the designated meeting place to transfer the cash, V4 received a text message from an unknown number, purporting to be an unknown cleaner, stating that the individual was locked in a client's building and needed help. V4 stated that she believed this was one of the cleaners, so V4 called SIVERD to tell him about the issue, and he stated that the cleaner had also texted him. Accordingly, SIVERD said that he needed to go assist the employee and could no longer meet V4 to give her the $20,000 cash.

58. The phone number purportedly belonging to the unknown cleaner was registered under Ad Hoc Labs, Inc., D/B/A "Burner." According to Burner records, this number was owned by the same cell phone number that SIVERD used in his text conversations with V4, and matched the public number listed for ROC Scrubby through open sources. Furthermore, the Burner number was created on the same date that it was first used to message V4.

59. The next day, SIVERD and V4 again agreed to meet. When SIVERD arrived, he informed V4 that he could not give her the $20,000 in cash because his wife found out about it and did not want him giving V4 that much money in cash. Shortly after, on or about August 18, 2024, V4 determined that she would never get the $20,000 or her back wages, and decided to stop working for SIVERD.

60. During "P.B.'s" text conversations with V4, "P.B." informed her that his office address was 300 Linden Oaks, Suite 200, Rochester, NY. Open-source information showed that V5 is a real individual with the same name as the "P.B." purportedly communicating with V4.

V5 was listed as an employee of a financial services company located at another address on Linden Oaks, Rochester, NY.

61. TFO Thomsen and I interviewed V5 at the Linden Oaks address. V5 stated that he did not know anybody named "Timothy Siverd" or "Timothy Buttino." V5 also stated that he could not have been the individual messaging V4 because he is not even a financial advisor; rather, he deals with office administration tasks. He also affirmed that the Burner number used to contact V4 was not his number. I showed V5 a picture of SIVERD, and V5 stated that he had never seen him before.

62. V5's name is a "means of identification" within the meaning of 18 U.S.C. § 1028A. Furthermore, V5's name and purported status as a financial advisor was used in furtherance of deceiving V4, and without lawful authority.

63. Aside from the various assertions in relation to withholding V4's pay, V4 stated that SIVERD would make other assertions that V4 believed were designed to make people believe he was very wealthy. For example, V4 stated that SIVERD often spoke of being personal friends with one "J.A.," a high-profile member of the Buffalo Bills, and that they golfed together at Oak Hill Country Club; that SIVERD was close friends with the owners of Constellation Brands and used their private jet frequently; and that SIVERD's father was a billionaire.

## CONCLUSION

64. Based on the forgoing, I respectfully submit that there is probable cause to believe that SIVERD has committed the TARGET OFFENSES.

_____
SCOTT M. KENDALL
Special Agent
Homeland Security Investigations

Affidavit and Search Warrant submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this  8th  day of January, 2025.

_____
HON. MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE

18